THE STATE v. CUSHENBERRY, Appellant.

Division Two, June 12, 1900.

1. **Murder:** SUFFICIENCY OF EVIDENCE. A town marshal in Cameron, Mo., went in pursuit of a burglar. The marshal was next seen in the waiting room of the depot, with a negro under arrest. Two other negroes appeared, when the negro under arrest started to run, and the marshal followed him. Several shots were fired, and the marshal was found dead on the platform. Defendant was arrested in Topeka, Kan. He refused to leave without requisition papers, stated that he had never been in Missouri, and manifested much concern over the arrest, and finally asked if it was for the killing of the marshal. The two negroes in the junction depot at the time of the killing, identified defendant as the man the marshal had under arrest. One of them recognized defendant in jail. This witness had previously seen defendant in Missouri. While in jail at Topeka, defendant, being asked where that negro was from, replied "From Cameron, Mo., where that big marshal was from." The telegraph operator was of the opinion that defendant was the man the marshal had under arrest. Another witness, who was in the station that night, also identified defendant as the man under arrest. Other witnesses saw defendant in Cameron the day preceding the homicide. On the part of defendant a witness testified that he saw the man who shot the marshal, and that it was not defendant. There was some testimony in support of this and much against it. There was testimony that defendant was at Topeka at, before, and subsequent to the homicide. *Held*, that the evidence was sufficient to support a verdict of murder in the first degree.

2. **Evidence:** IDENTIFICATION: BELIEF. In order that the testimony of a witness should be received in identification of defendant, it is sufficient if he can testify that he believes defendant to be the person.

3. ——: ——: ——: CREDIT: MATTER FOR JURY. Where a witness, in identification of defendant, testifies that he believes him to be the person, the degree of credit to be attached to his testimony is a question for the jury.

4. **Felony:** ARREST WITHOUT WARRANT: OFFICER KILLED: INSTRUCTION AS TO PROVOCATION, ETC. Defendant was on trial for homicide of a city marshal. The officer had been notified that a burglary had been committed, and had arrested defendant without a warrant. While defendant was attempting to escape, the officer was killed. *Held,* that, a warrant not being necessary for the arrest where there was reasonable cause to suspect that a felony had been committed by the prisoner, it would be presumed that the officer, acting in his official capacity, saw such indications as induced the belief that the man he arrested was the guilty party and in the homicide there could have been no such thing as "just cause or provocation," "sufficient reason, cause, or extenuation," "heat of passion, or on sudden provocation," rendering instructions defining them necessary.

5. **Reasonable Doubt:** PROPER INSTRUCTION. An instruction that defendant is presumed to be innocent, and that, to warrant conviction, guilt must be established beyond a reasonable doubt, but to warrant a verdict of not guilty on that ground alone the doubt should be a substantial doubt of guilt arising from the evidence in the case, and not a mere possibility of innocence, is not objectionable as not allowing an acquittal on account of any reasonable doubt arising from any insufficiency in the evidence, because, whenever the sufficiency of the evidence is considered, its insufficiency is also considered.

6. **Failure to Instruct:** SELF-INVITED ERROR. Where defendant's counsel refuse an offered instruction on murder in the second degree and on manslaughter in the fourth degree, failure to give such instructions can not be urged as error.

7. **Felony:** ARREST ON REASONABLE SUSPICION: OFFICER KILLED: MURDER IN FIRST DEGREE. As the officer had arrested defendant on reasonable suspicion that a felony had been committed by defendant, killing him in an attempt to escape was no less murder in the first degree, and no cause of self-defense could arise.

State v. Cushenberry.

8. **Juror:** MISCONDUCT: APPELLATE PRACTICE. Where affidavits of misconduct on the part of a juror are met with the affidavits of the juror himself, and the trial court has made a ruling on the point, it will not be reviewed on appeal.

9. **New Trial:** NEWLY-DISCOVERED EVIDENCE: DILIGENCE. A motion for a new trial on the ground of newly-discovered evidence is properly denied where the application discloses no diligence, and the evidence was cumulative, and was not of such a nature as might change the result of a new trial.

10. **Reputation of Witness:** SHORT RESIDENCE. Where a witness who had been in a locality but a few weeks was known as "a housebreaker," evidence of his reputation is not rendered inadmissible because of his short residence.

Appeal from Clinton Circuit Court.—*Hon. A. D. Burnes,* Judge.

AFFIRMED.

*Frost & Frost, L. B. Hooper, John A. Cross* and *A. J. Althouse* for appellant.

(1) Instructions 1 and 3, given at the request of the State, are improper as an entirety, or singly, for 1 alone allows a conviction for murder in the first degree if the killing was done "deliberately," etc., while that technical term is no where defined except in said instruction 3, where lack of "heat of passion" and "sudden provocation," equally technical terms, are used in the definition without any explanation as to what is meant by these terms, which is improper. State v. McKinzie, 102 Mo. 627. (2) Instruction 2, given at the request of the State, is improper in that the jury seem to be informed by it, that if a deadly weapon without just cause or provocation be used the user must be presumed to do it wickedly and from a bad heart; and yet the jury are left wholly without information as to what is meant by the terms "just cause or provocation." And in the same instruction

the jury are told that if defendant took Leonard's life, etc., "without sufficient reason, cause or extenuation," then he was guilty of murder in the first degree.   Yet there is nothing in or out of the instruction to enlighten the jury as to what in law amounts to "sufficient reason, cause or extenuation," and it is therefore too limited in its scope in leaving the jury without any guide as to what would extenuate, or justify the killing.   State v. Sprague, 149 Mo. 422.   (3) . Instruction 5 given at the request of the State is improper in that it only allowed the jury to acquit the defendant for a reasonable doubt of his guilt in case it arose from the evidence in the case, and did not allow his acquittal on account of any reasonable doubt of guilt arising from any lack or insufficiency of the evidence.

*Edward C. Crow*, Attorney-General, *F. B. Ellis* and *James E. Goodrich* for the State.

(1)   The affidavit of Messrs. Cross and Musser is not to be considered for the settled reason that a juror can not impeach his own verdict, nor will the affidavit of third parties be received after the jury has been discharged, when the juror objected to denies the statement in the affidavits. State v. Cooper, 85 Mo. 256; State v. Shafer, 116 Mo. 96.   (2) Defendant complains of error on account of failure to instruct on murder in the second degree and manslaughter. Following State v. Albright, 144 Mo. 653, it was unnecessary.   State v. Duncan, 116 Mo. 312.   (3)   It was not necessary in this case to define what constitutes technical "heat of passion" inasmuch as the facts in evidence did not tend to show the existence of any passion, and only in such case is it reversible error to fail to give instructions defining said term. Under repeated decisions, failure to so define are regarded as harmless, being held to be immaterial.   State v. Ellis, 74 Mo. 207; State v. McGinnis, 76 Mo. 326.   "Heat of pas-

sion" could not arise in this case.   State v. Albright, 144 Mo. 653; State v. Duncan, 116 Mo. 312.   Error complained of, if error at all, is an immaterial one.   State v. McGinnis, 76 Mo. 326.   (4)   Proof of burglary was clearly admissible, as it was thereby shown that a felony had been committed.   Following this it was immediately communicated to the deceased, who acting upon such information, had reasonable ground for suspecting the defendant of being guilty. State v. Albright, 144 Mo. 638; State v. Underwood, 75 Mo. 230.   (5)   The alleged newly discovered evidence will not suffice to procure new trial.   State v. Welsor, 117 Mo. 583. (6)   Testimony as to reputation of Wilmer Baker at Chillicothe was admissible.   He lived there about three weeks. He was a nomadic character, and by his conduct he established a reputation a few days after he arrived in Chillicothe. State v. McLoughlin, 149 Mo. 33; Deery v. Cray, 5 Wall. 807.

SHERWOOD, J.—This appeal comes here because defendant, a negro, was found guilty of murdering George H. Leonard, the marshal of Cameron, on the morning of March 16, 1898, by shooting him to death with a pistol, and sentenced to be hanged for that crime.

The circumstances attendant on the murder are, in outline, these:

A dwelling house had been burglariously entered on the night of the fifteenth of March, 1898, and from that house, Captain Beery's, a pint bottle half full of California brandy had been stolen from the sideboard.   When Captain Beery was aroused about two o'clock on the morning of the sixteenth of March, 1898, he got up, went down stairs, and found his house had been burglariously entered and the bottle of brandy stolen from the sideboard.

Ascertaining this, he immediately caused the marshal,

Leonard, to be telephoned the fact, and he being at home, put on his uniform, with a gray overcoat over it, and putting his revolver, with the scabbard on, into his pocket, went in pursuit of the burglar.   He is next seen in the waiting room of the junction depot, with a kind of "brown colored darkey" under arrest.   He took this darkey up to the ticket window and began searching him, and took from him a pair of shoes, and set them in the ticket window.   Just then two other negroes came in at the south door of the depot; the marshal called to them and asked them where they were from, and where they were going, and then the negro under arrest started to run toward the north door of the depot, and ran up into the northwest corner of the waiting room, and the marshal after him.   Then several shots were fired and the negro ran out of the south door with the marshal hanging onto him, and when the witness went through the ladies' waiting room and around to the south door of the depot he found the marshal lying dead on the platform. This was about 3:20 in the morning. As to what occurred at the depot, this is the testimony of Wilfong, the telegraph operator, who was there in the discharge of his duties. He also saw the two darkies who came into the south door and noticed that one of them had bad eyes, and that they had with them a mandolin and guitar box. On the next morning he recognized both of these negroes, when they were arrested, and then discovered that one of them, Charles Brooks, whom he thought the night before had bad eyes, had lost an eye, and that his companion, Eli Reubens, had lost a part of his right hand.   Wilfong fully identified these two negroes at the trial.

Charles Brooks, one of the two negroes who had the musical instruments with them at the junction depot, recognized defendant as the negro he saw the marshal have under arrest at the depot.   He states that he and his "partner," Eli Reubens, arrived from Chillicothe at Cameron in a box car about

two or three o'clock on the morning of the sixteenth of March, 1898, and after sitting and talking in the box car awhile, went into the junction depot and there saw the marshal with a negro under arrest; that the marshal spoke up and asked him and Reubens if they knew the prisoner, when Reubens answered he did not. Then the marshal said, "Come over here boys," and they went over nearer to the marshal, and then the prisoner started like he was going out the door, and the marshal started after him. The prisoner crouched down in the corner, and the marshal stood over him and said, "Here, what are you up to," then a shot was fired and Brooks and his partner ran; the latter ran first, and a white fellow ran out between Brooks and his partner. Brooks and his partner ran down the track, hid under a milk house, finally left there and went still further down the track and built a fire, where they were arrested the next morning by two white men and taken back to Cameron and detained there until after the preliminary trial was over.

Brooks recognized defendant as the negro the marshal had arrested on that night, and when defendant was brought back to Clinton county and placed in jail, Brooks recognized him there as defendant peeped through the bars of the jail at him. Eli Reubens, Brook's "partner," also recognized defendant as being the same negro the marshal had under arrest that night and corroborates Brooks in every essential particular as to what then and there occurred. Reubens also recognized defendant and identified him in the jail in Topeka, Kansas, as being the same man arrested by the marshal. On this last occasion Reubens says he passed along by the cages in the jail and as he did so, defendant spoke to him from one of the cages, and says, "Hello, don't I know you?" Reubens says he replied: "I told him, 'Well, I don't know, perhaps you might know me;'" and then Reubens gave defendant a chew of tobacco, as requested, and left the jail.

Reubens had previously seen defendant at Hannibal, Missouri, and had spoken to him on two occasions, at that place. After Reubens had left the Topeka jail, as already stated, Lawson, deputy sheriff and keeper of the jail, says he asked defendant where that negro, referring to Reubens, was from, whereupon defendant replied he was "from Cameron, Missouri, where that big marshal was from."

And Lawson also testifies that defendant also stated at the same time, "I know that G-d d-d negro."

H. O. Stewart, a white man, also corroborates the statements of Wilfong, Brooks and Reubens in several and most of the essential particulars.    Stewart, who resides, and then resided in Cameron, testified that he was in the junction depot on the night of March 15, 1898, and fell asleep; he had been asleep some hours, when he was awakened by the marshal and his prisoner passing in front of him. They walked over to the ticket window and stopped there, when the marshal began searching the prisoner, and took a pair of shoes out of his pockets, and also a bottle of something out of his pockets, and set them in the window. He says, also, that the marshal took something off the prisoner's neck; what it was, he doesn't know. Just then two negroes came in at the south door. Leonard turned around and began talking to them; and Stewart also turned around and looked at them, his attention being attracted to them. At this juncture the prisoner made a movement and went over into the corner with the marshal right after him, when two shots were fired, when Stewart went into the lunch counter, and when he came out, Leonard lay on the sidewalk dead, and his overcoat was afire. Stewart identifies the two negroes he saw there that night, as Brooks and Reubens, and is of the opinion that the marshal's prisoner is the defendant, although he can not swear positively that he is the same man.

Upon an autopsy being held on the body of Leonard, he

was found to be shot through the breast, a fatal wound, and shot also through the leg above the knee. These wounds were inflicted by a pistol of the same calibre as that the marshal had when he left home on that fatal night. The scabbard of his pistol was found on his person, as well as his watch and a lady's open-faced, shell case, gold watch, enameled in color, and having attached a black cord with a slide on it; these things were returned to Mrs. Leonard with the body of her husband.

Wilfong, though he would not swear positively to the identity of the marshal's prisoner with defendant, yet was of the opinion or impression or belief that they were the same person. ‘ The defense in this case was an alibi, the assertion being made on behalf of defendant that he was in Topeka, Kansas, on the day before and on the day of the murder and had never been in Missouri.

Parks, who was appointed in 1898 by the Governor, to go to the State of Kansas and bring back defendant to this State testified that on his reaching Topeka he went to the jail and told defendant he had come after him to take him to Missouri, upon which he said: "Back to Missouri where I never was." Parks told him to get ready, when he said, "Get your requisition papers." Parks then told him he had them in his pocket, and then put irons on him and put him in the wagon. As they were going over to the depot, defendant seemed anxious to know what charge was against him over there, and Parks told him, "For a little meanness you are accused of over in Missouri," but did not tell him what it was. After the train got in motion, defendant repeated his question, what Parks was taking him back to Missouri for, but Parks gave him no satisfaction, saying in answer: "Just a little trouble you are accused of over there in Missouri." On arriving at Kansas City, and on going down to the depot to take another train, defendant asked Parks the same ques-

tion over again, when Parks replied: "It matters not what it is, just a little trouble as I told you." When they went into the depot, defendant said: "When did this trouble occur?" Parks replied: "In the month of March;" and immediately defendant asked: "Is it for the killing of that damned marshal over there?" and when told that it was, defendant turned away and sang a foolish little song, and stood by the window until placed by Parks on the train.

As the train started down the river towards the bridge, they looked across and saw a light on the hill, when defendant remarked: "I lived eleven years over where that light is." When the train reached and had advanced into Clay county, Smithville was called out by the porter, when defendant said: "My God, is this old Smithville?" and on being told that it was, defendant remarked: "I was raised right here, two miles north of Smithville." Several witnesses, W. H. Berkley, Dr. McArthur, George H. Bassett, D. F. Meadows, Eben Thomas and Albert Thomas testified to having seen defendant on the fifteenth day of March, 1898, in Cameron. Bassett stated that although he could not swear positively defendant was the same man, yet he said that to the best of my judgment he looks like the same man that came into my place (in Cameron) on the night of the fifteenth and called for a pint of whiskey; this was about eleven o'clock at night. Bassett said he had the opportunity to take a good look, and did so, at defendant, as the bartender served him with the whiskey; and stated: "His eyes; I never will forget them."

Berkley testified that as he was in his barn on an alley in the rear of his premises, about two o'clock in the afternoon, defendant came by and looked into the window he had just opened, and then walked on, and states that in his opinion, defendant is the same man; that since then he has seen defendant walk, a springy walk; and that "the walk corresponds exactly" with that of the defendant.

D. F. Meadows says he, too, saw defendant in Cameron twice on the fifteenth of March, once as he took a glass of beer in a saloon, and later in the day, about night, he saw him as witness was going home, around the Rock Island road, and as he passed by him on his way home, defendant stepped back in between some coaches of the work train. He states that he recognizes defendant by his eyes, and also by the absence of a middle front tooth, which dental absence he noticed as he drank the glass of beer in the saloon. He thinks defendant is the same man.

Dr. McArthur, a physician of Cameron, stated that on the date mentioned he saw defendant twice in the streets of Cameron; once, in the afternoon between four and five o'clock, when he was riding horseback, he met defendant, was within ten feet of him, perhaps less, and his looking up and down at the streets and buildings in the way he did impressed the witness that he was a stranger. After supper Dr. McArthur went on the streets again, responding to a call, and on his return saw defendant coming towards him, and just about a block distant, and as defendant came across the street, he came on down and the doctor met him face to face and recognized him as the same man he had previously seen, and as the doctor turned and went on up town, he saw defendant go across the tracks and go into one of three or four empty cars standing on the Rock Island track. Dr. McArthur states positively that he identifies defendant as the same man that he then saw.

Eben Thomas, a negro, who lives at Cameron, and had lived there for forty years, said he saw defendant in Cameron about five o'clock in the afternoon on the tracks of the Hannibal road; that he saw defendant was a stranger; got pretty close up to him, and thought that being a stranger and a colored man, he would speak to him, and looked him in the face, but defendant did not speak nor did witness; that he recog-

nized defendant the first time he saw him after that, and thought he was the man he had previously met; that he "looks just like he is the same; appears to me like he is the same man."

Albert Thomas, also of Cameron, stated that at that place on the fifteenth of March, 1898, about fifty feet across from the old depot, he saw defendant. To use his exact language: "I saw that very man, I think, with Marion Fuller. He is the gentleman I saw with a black cap on and a light overcoat." He states this was about three o'clock in the afternoon, and defendant was some fifty feet away. Charles Brooks had also stated that defendant had on a cap and light overcoat.

On the part of defendant, Wilmer Baker testified it was Henry (alias Roxy) Baker that shot the marshal in the depot, and that he saw him do it. There is some testimony in support of that statement and much against it, and testimony to the effect that defendant was in Topeka, Kansas, at and before, and subsequent to, the commission of the murder, but the testimony already mentioned as given on the part of the State, as well as other testimony subsequently offered in rebuttal, was of a contrary effect.

1. No one can read the testimony contained in this record without being fully impressed with the conclusion that it fully supports the verdict of the jury; and when this is the case, the verdict must stand, notwithstanding there is a conflict in the testimony, and this court has always so decided. So that, given a verdict of a jury in a criminal cause with testimony to sustain it, it is of no consequence that conflicting testimony on the part of the accused has opposed that offered by the prosecution. In such circumstances the only thing left to do is to consider whether error has occurred in instructions given or refused or otherwise during the progress of the trial. And while on the subject of the testimony in this cause, it is well enough to say, for it is indubitably the

settled law, that it is not at all necessary for a witness to iden-
tify a person or thing by pointedly swearing to his or its
identify; it is sufficient for the reception of his testimony for
him to testify that he believes the person or thing to be the
same, or the handwriting to be that of a particular person,
although he will not swear pointedly; and the degree of credit
to be attached to his testimony, is a question for the jury.

In Massachusetts, it has been held that where the only
question in the trial of a criminal case is the identity of the
prisoner with the guilty party, the jury may be justified in
returning a verdict of guilty although no witness will swear
positively to the identity.    [Commonwealth v. Cunningham,
104 Mass. 545.]    In that case, the witnesses would not swear
that the prisoner was the same man they saw on the wagon,
but that "he resembled him."    And the court say: "Upon
this question of identity, the evidence offered was all of it
competent, and proper for the consideration of the jury.    It
is impossible to say that it had no tendency to convict the de-
fendant.    Its sufficiency was to be estimated and weighed ex-
clusively by them."    [State v. Babb, 76 Mo. loc. cit. 504;
State v. Guild, 149 Mo. loc. cit. 381.]

2.    Concerning the instructions, those given on behalf
of the State were, speaking in a general way, such as have
frequently received the sanction of this court.    These in-
structions, as well as those given at the instance of defendant,
will accompany this opinion.

Objection has been taken to several of these instructions,
which will now receive comment.    No person saw the arrest
when it occurred, and it will therefore be presumed that
Leonard, who was both marshal and deputy sheriff, did his
full duty in making the arrest.    He had on his uniform, and
over that his overcoat, but the latter was open, thus disclosing
his uniform.    In addition to that, the prisoner quietly sub-
mitted to arrest, and while being searched in the depot wait-

ing room; but aside from that, the presumption of law aforesaid, should prevail. The officer needed no warrant if he had reasonable cause to suspect that a felony had been committed by the prisoner. [State v. Underwood, 75 Mo. loc. cit. 236.]

Leonard was informed that a felony had been committed on that very night. What grounds he may have had to suspect the prisoner as the man, have not been disclosed, but we will presume that acting in his official capacity, as marshal and deputy sheriff, he saw such indications as induced the non-negligent belief that the man he arrested was the guilty party. A reasonable ground of suspicion has been defined to be: "A deceptive appearance of guilt arising from facts and circumstances misapprehended or misunderstood, so far as to produce belief." [Smith v. Ege, 52 Pa. St. loc. cit. 422.] Bishop says: "If a person is walking the streets at night, and the indications are that he has committed a felony, watchmen and beadles have authority at the common law to arrest and detain him in prison for examination, though the proof of an actual felony committed may be wanting." 1 Crim. Proc., sec. 182. See, also, State v. Grant, 79 Mo. loc. cit. 134, 135. Presuming, then, that the officer acted by right and not by wrong, and so are all the precedents, there was and could be no such thing as "just cause or provocation" or "sufficient reason, cause or extenuation," or "heat of passion or on sudden provocation," and consequently no necessity for defining these terms; because in such cases to resist an officer, "passion is wickedness and resistance crime." [Brooks v. Com., 61 Pa. St. 352; State v. Duncan, 116 Mo. loc. cit. 312.]

3. Objection is also urged to instruction 5 of the State's instructions, which is the following:

"5. The court instructs the jury that the defendant is presumed to be innocent, and it devolves upon the State to prove his guilt beyond a reasonable doubt, and unless the

State has established the guilt of the defendant, as charged in the indictment, to your satisfaction, beyond a reasonable doubt, you should give the defendant the benefit of such doubt, and return a verdict of not guilty. But such a doubt to authorize an acquittal on that ground alone, should be a substantial doubt of guilt arising from the evidence in the case, and not a mere possibility of innocence."

Nothing objectionable is seen in this instruction. It is said in support of the objection that it "did not allow an acquittal on account of any reasonable doubt arising from any lack of insufficiency in the evidence." No reasonable doubt can arise merely on the fullness and completeness of the evidence; it is only where evidence is absent or lacking that such doubt can arise. *Whenever the sufficiency of the evidence is considered, necessarily you must consider its insufficiency; the two are inseparable in thought.*

The same point is considered and discussed in State v. Holloway, 156 Mo. 222.

4. The court offered defendant's counsel an instruction on murder in the second degree; and on manslaughter in the fourth degree, but they refused to accept them, and so they were not given. Self-invited error can not be made the basis for the assignment of error. [R. S. 1889, sec. 4115; State v. Keele, 105 Mo. 38.] This was the rule at common law.

So that, even conceding that this was a case suitable for such instructions, which we do not do, no error occurred concerning them.

5. It is in the record, and relied on by defendant that: "Defendant excepted to the court's instructions to the jury as prayed by the State as a whole, and to each separately, on the ground that they were not supported by the evidence, and they did not instruct the jury on all questions of law arising in the case necessary for their information in giving their verdict."

Sufficient has been said about murder in the second degree and manslaughter in the fourth; but defendant asserts that an instruction should have been given on self-defense. It seems that this assertion is based upon the idea that the killing "grew immediately out of an onset by the deceased upon his slayer, which was continuing at the time of the shooting," and therefore, "the act must have been either justifiable or excusable homicide and not murder in the first degree."

If an officer lawfully pursuing a criminal whom he has arrested and who is endeavoring to escape from him, can be guilty of an assault when trying to re-arrest him, then doubtless the doctrine of self-defense would apply; otherwise not. The evidence shows that a burglary had been committed, whether defendant committed it or not. And if the officer acted on reasonable suspicion and upon indications which led him to make the arrest (as to which see authorities cited in paragraph 2), then killing him was no less than murder in the first degree, and consequently no cause of self-defense could arise.

6. As to misconduct on the part of juror Shackleford, the affidavit made against him by two negroes, was met by his own affidavit, and as the trial court has made a ruling on the point and is doubtless well acquainted with the affiants, we shall pursue our ordinary custom in such matters and refuse to interfere with that ruling. [State v. Howell, 117 Mo. 307; State v. Howard, 118 Mo. 127; State v. Taylor, 134 Mo. 109].

7. The motion for new trial, in so far as based on newly discovered evidence, was properly denied. Defendant had been in jail ever since July, 1898; he had one trial in 1899 and therefore knew what would be required on a second trial. His application therefore discloses no diligence, nor is any stated. The statement of facts constituting the alleged

diligence must be made clear and plain. Ordinarily, the purpose of the new evidence must not be to establish a defense before known. An alibi was the defense on the former trial. The new evidence must not be cumulative, nor does it appear probable that it would change the result if a new trial were granted; the affidavit of the witness himself must be produced, or his absence accounted for; and the evidence must not be merely to impeach the character or credit of a witness or show him hostile to the defendant. [State v. Ray, 53 Mo. 345; 1 Bishop New Cr. Proc., sec. 1279.] Tested by these rules, the application falls short of meeting the stated requirements.

8. In conclusion, there was ample evidence to support the conviction, notwithstanding there was some conflict in the evidence. So clear and convincing was the evidence on the part of the State as to what transpired at the junction depot, and so strongly corroborated was it by a number of witnesses who testified to the presence of defendant in Cameron on the day and night preceding the murder, thus overcoming, if believed, the plea of alibi, that it is difficult to see how the jury could very easily reach any other conclusion than that they did. And in this connection, and not to be forgotten, are the damaging admissions made by defendant of former residence in Missouri, which he had but recently denied, and of acquaintance with Reubens; nor of the facts that both Wilmer Baker and Nelson Bailey were successfully impeached as well by reputation as by contradiction. It is insisted that evidence was inadmissible as to the reputation of Baker during the time he lived in Chillicothe, a few weeks. But this man was a nomad of such malodorous reputation that soon after his arrival in Chillicothe, he was pointed out as "a house-breaker." If the reputation of such an one could not be impeached in the locality where last he lingered, the result would be he could not be impeached at all; and so he

would be allowed to testify from the same high plane as the most reputable citizen.     Such a doctrine would be intolerable, and often defeat the ends of justice.     We do not subscribe to it.     The testimony of Holtzclaw and Carroll on this point was consequently admissible.

We have carefully examined the record in this case, and finding no prejudicial or substantial error therein, we consequently affirm the judgment and direct that the sentence pronounced by the law be executed.     All concur.

### INSTRUCTIONS ON BEHALF OF THE STATE.

1.     The court instructs the jury that if they believe from the evidence, beyond a reasonable doubt, that the defendant, at the county of Clinton and State of Missouri, at any time prior to the finding of the indictment, willfully, feloniously, deliberately, premeditatedly and of his malice aforethought, shot and killed George H. Leonard in the manner and by the means charged in the indictment, they will find the defendant guilty of murder in the first degree, and so say by their verdict.

2.     If you believe and find from the evidence in this cause, beyond a reasonable doubt, that the defendant, at the county of Clinton and State of Missouri, at any time prior to the 15th day of September, A. D. 1898, the date of the finding of the indictment herein, willfully, feloniously, deliberately, premeditatedly and of his malice aforethought, shot and killed George H. Leonard, you should find him guilty of murder in the first degree.     He who willfully, that is, intentionally, uses upon another at some vital part a deadly weapon, such as a loaded pistol, must in the absence of qualifying facts, be presumed to know that the effect is likely to be death and knowing this must be presumed to have intended death, which is the probable consequence of such an act; and if such deadly weapon is used without just cause or prov-

ocation, he must be presumed to do it wickedly and from a bad heart. If, therefore, you believe, and find from the evidence in this case that the defendant took the life of George H. Leonard by shooting him in a vital part, with a pistol, with a manifest design to use such weapon upon him, and with sufficient time to deliberate and fully form a conscious purpose to kill and without sufficient reason, cause or extenuation, then such killing is murder of the first degree. And while it devolves upon the State to prove the willfulness, deliberation, premeditation and malice aforethought, all of which are necessary to constitute murder in the first degree, yet these need not be proved by direct evidence, but may be deduced from all the facts and circumstances attending the killing; and if you can satisfactorily and reasonably infer their existence from all the evidence, you will be warranted in finding the defendant guilty of murder in the first degree.

3. The word "willfully," as used in the indictment and the instructions, means intentionally, not accidentally.

The word "feloniously" means wickedly and against the admonition of the law.

Malice, in its legal sense, does not mean spite or ill-will, but it means a condition of the mind that indicates a heart devoid of social duty and fatally bent on mischief.

Deliberately means in a cool state of the blood, and as applied to an act, means that the act was not done in the heat of passion or on sudden provocation, and that it was prompted by deep malignity of heart or motive of revenge.

Premeditatedly means thought beforehand for any length of time, however short.

Malice aforethought means with premeditation and malice.

4. If you find the defendant guilty of murder in the first degree, you will merely say so in your verdict; to the court belongs the duty and responsibility of fixing the punishment the law provides for this crime.

If the jury find the defendant guilty of murder in the first degree they will sign, by their foreman, the following form of verdict: "We, the jury, find the defendant, Robert Cushenberry, guilty of murder in the first degree, as charged in the indictment."

5. The court instructs the jury that the defendant is presumed to be innocent, and it devolves upon the State to prove his guilt beyond a reasonable doubt, and unless the State has established the guilt of the defendant, as charged in the indictment, to your satisfaction, beyond a reasonable doubt, you should give the defendant the benefit of such doubt, and return a verdict of "not guilty."

But such a doubt to authorize an acquittal on that ground alone, should be a substantial doubt of guilt arising from the evidence in the case, and not a mere possibility of innocence.

6. The court instructs the jury that in determining as to the guilt or innocence of the defendant, you should take into account the testimony in relation to his character, and should give to such testimony such weight as you deem proper, but if from all the evidence, you are satisfied beyond a reasonable doubt, as defined in these instructions, that the defendant is guilty, then his previous good character, if shown, can not justify, excuse, palliate or mitigate the offense, and you can not acquit him merely because you may believe he has been a person of good repute.

7. You are the sole judges of the weight of the evidence, and the credibility of the witnesses in this cause, and if you believe any one of them has willfully sworn falsely as to any material fact in the cause, then you are at liberty to disregard the whole, or any part of the testimony of any such witness.

8. The defendant, Robert Cushenberry, is a competent witness in his own behalf, and his testimony should be received and weighed by the same rules that govern the testi-

mony of other witnesses, but on passing on the weight due to such defendant's testimony, the jury may consider the fact that he is the defendant, and his interest in the result of this case.

9.   If the jury find from the evidence that the defendant, Robert Cushenberry, made any statement or statements in relation to the offense charged in the indictment, then what the defendant said against himself the law presumes to be true, because said against himself; what the defendant said for himself the jury are not bound to believe, because it was said in a statement or statements proved by the State, but the jury may believe or disbelieve it, as shown to be true or false by the evidence in this cause.

It is for the jury to consider, under all the circumstances, how much of the whole statement or statements proved by the State, the jury from the evidence in this cause, deem worthy of belief.

10.   If the jury find and believe from the evidence in this case that the defendant while confined in the county jail of Clinton county, Missouri, by the use of a saw, attempted to escape therefrom, with the intent of avoiding trial for the charge herein, they may take that fact into consideration in determining the guilt or innocence of the defendant.

### DEFENDANT'S INSTRUCTIONS.

1.   The court instructs the jury that the indictment against the defendant is merely a formal charge, and is no evidence of the guilt of the defendant, and the law presumes the defendant innocent of the charge preferred in the indictment, and this presumption attends him throughout the whole trial, until his guilt is proven beyond a reasonable doubt.

2.   The jury are instructed that the law gives the defendant the right to testify in his own behalf, and while the jury may, in determining the weight to be given to his tes-

timony, take into consideration the fact that he is the defendant, and the interest he has in the case; still, the jury are not for this reason justified in disregarding his testimony if they believe from all the facts and circumstances in evidence, including this fact, that he is telling the truth. The weight to be given to his testimony is to be determined by the same principle as that of any other witness.

3.    The jury are instructed that they are the sole judges of the credibility of the witnesses, and of the weight and value of their testimony. In determining such weight, credit and value, you will take into consideration the character of the witness, his bias or prejudice in the case, his manner on the stand and of testifying, his interest, if any, in the result of the case, his relation to or feeling for the defendant or deceased, the probability of his statement, as well as all other facts and circumstances detailed in evidence. And in this connection if you believe that any witness has willfully sworn falsely to any material facts in issue in the case, you are at liberty to disregard all, or any part of such witness' testimony.

4.    Where a person on trial for a crime shows that he was in another place at the time when the act was committed he is said to prove an alibi. One of the defenses interposed by the defendant in this case is what is known as an alibi—that is, the defendant was at another place at the time of the commission of the crime. The court instructs the jury that such defense is as proper and as legitimate, if proved, as any other, and all evidence bearing upon that should be considered by the jury. If in view of all the evidence the jury have a reasonable doubt as to whether the defendant was in some other place when the crime was committed, they should give the defendant the benefit of the doubt and find him not guilty. As regards the defense of an alibi, the jury are instructed that the defendant is not required to prove that defense beyond a reasonable doubt, to entitle him to an acquit-

tal, it is sufficient if the defense upon that point raises a reasonable doubt of his presence at the time and place of the commission of the crime charged. The court further instructs the jury that if they believe from the evidence that at the time of alleged murder, and at the time the crime was committed, the defendant, Cushenberry, was at the city of Topeka, in the state of Kansas, as testified to by some of the defendant's witnesses, and was not present at the scene of the murder at the time of its commission, then you must acquit the defendant. The jury are instructed that if you entertain any reasonable doubt as to whether or not the defendant, Cushenberry, was at the city of Topeka, or at the scene of the murder, Cameron, Missouri, at the time the murder was committed, then it is your sworn duty under the law to give the benefit of the doubt to the defendant and acquit him. The jury are instructed that if you should entertain a reasonable doubt as to the defendant's guilt, he should be acquitted, although the jury might not be able to find the alibi was fully proven.

5. The defendant is presumed to be innocent, and this presumption attends him throughout the progress of the whole trial, until it has been overcome by evidence proving his guilt beyond a reasonable doubt. In a criminal case it is not sufficient to convict the defendant upon a mere preponderance of the testimony, but before the jury should convict the guilt of the defendant must be clear and convincing, so that the jury feel convinced, to a moral certainty, that the defendant is guilty as charged.