THE STATE v. THOMAS MURPHY, Appellant.—29 S. W. (2d) 145.

Division Two, June 11, 1930.

*Paul A. Richards* for appellant.

*Stratton Shartel,* Attorney-General, and *Henry Depping,* Assistant Attorney-General, for respondent.

HENWOOD, C.—An indictment was filed in the Circuit Court of the City of St. Louis, by which the defendant is charged with murder in the first degree. The jury found him guilty of murder in the first degree and assessed the death penalty. The trial court sentenced him accordingly, ordering that he be executed on January 4, 1929, and, in due course, he appealed.

The evidence is substantially as follows:

Charles A. Reilly, the victim of the alleged homicide, was operating a drug store at 3400 Chippewa Avenue in the city of St. Louis. Across the rear end of the drug store was the soda fountain. Immediately behind the soda fountain was the prescription room.

Arthur Lubker, a driver for the Yellow Cab Company, testified: In the evening of June 16, 1928, he was called to 3546 Gravois Avenue in the city of St. Louis. As he approached that address,

a man hailed him, and said he ordered the taxicab. This man entered the taxicab and said: "3221 Chippewa." Later, this man directed him to go to Reilly's drug store at 3400 Chippewa, and, after indicating that he had a gun and that it was his intention to "hold up" the drug store, this man told him, if he didn't obey instructions, it would be "too bad." When they arrived at Reilly's drug store, about 8:30 P. M., this man said: "Swing your wheels out so you can get away, and leave both doors open and your motor running, and walk inside, and I will, be right behind you." He entered the drug store with this man behind him. Reilly saw this man, ducked down behind the soda fountain, and ran into the prescription room. This man ran after Reilly, and a shot was fired in the prescription room. Then, this man came out of the prescription room, jumped over a cigar counter, and ran out of the drug store, through the front door. When he (Lubker) went outside, his taxicab was gone. He "couldn't say positively" who this man was.

Kenneth Wirtel, a high school student, was employed at the drug store, and was on duty at the time of this occurrence. He testified: About 8:30 P. M., on June 16, 1928, a taxi driver entered the drug store, with the defendant a few feet behind him. The defendant had a gun in his right hand, and gave the command: "Not one of you move!" Reilly ran into the prescription room, and the defendant followed him. "There was a lot of noise, falling bottles, and then a shot." Then, defendant ran out of the store, jumped into the taxi, and drove away, alone. He was "absolutely" positive that defendant was the man who came into the drug store behind the taxi driver. He did not tell the truth at the coroner's inquest, when he testified that he did not see the man at the jail who shot Reilly, because he was told "they would get him" if he identified defendant as the man who shot Reilly.

The testimony of Lionel Joseph, "apprentice druggist" at Reilly's drug store, was substantially the same as that of Kenneth Wirtel, except as to the identification of the defendant. He said he "could not positively" identify the defendant as the man who came into the drug store with the gun.

Ralph James Bold testified: He lived in the vicinity of Reilly's drug stort. He and his wife and his sister-in-law were in Reilly's drug store at the time Reilly was killed. He saw the taxi driver and defendant enter the drug store. Defendant had a blue-steel automatic pistol in his hand when he entered the store. Defendant followed Reilly into the prescription room; a shot was fired; and defendant ran outside, with a gun in his hand, jumped in the taxicab, and drove away. He was "positive" defendant is the man who came into the drug store with the pistol in his hand.

James M. Lambert, who lived in the vicinity of Reilly's drug store, testified: He saw defendant loitering about the outside of Reilly's drug store between twelve o'clock, noon, and 2:30 P. M. on June 15, 1928, and between ten A. M. and 12:30 P. M. on June 16, 1928.

Two physicians, Dr. Albert A. Gebhart and Dr. Theodore L. Carriere, testified that Reilly's death resulted from a bullet wound in his chest. Dr. Gebhart examined Reilly's body within a few minutes after he was shot. Dr. Carriere made an autoptical examination of Reilly's body the next morning.

In a written confession, dated June 19, 1928, the defendant admitted that he loitered around Reilly's drug store on June 15th and June 16th and selected it as a good prospect for a "hold up;" that, about 8:30 in the evening of June 16th, he ordered a yellow taxicab from the 3400 block on Gravois Avenue and directed the driver to take him to Reilly's drug store; that he forced the driver to enter the drug store ahead of him and attempted the "hold up" he had planned; and that he followed Reilly into the prescription room and shot him. Four police officers testified that the defendant dictated and signed this confession voluntarily and without coercion or promise of leniency.

After making this confession, the defendant accompanied Lubker, the taxi driver, and several police officers over the route traveled by him in the taxicab on the night of the attempted "hold up." He pointed out the place where he ordered the taxicab and the place where he entered the taxicab. He also went into the drug store and made an explanation as to his movements there at the time of the attempted "hold up." The statements and explanations made by the defendant on that occasion are in harmony with the testimony of the State's witnesses relating to the same matters.

The defendant, testifying in his own behalf, said: He was 27 years of age. He arrived in St. Louis on June 9, 1928. On the day before, he was released from the penitentiary at Nashville, Tennessee, where he had been imprisoned for twenty-seven months. He had been previously imprisoned in the Ohio penitentiary. He was convicted of forgery in Ohio and of larceny in Tennessee. After his arrival in St. Louis, he was arrested twice "on suspicion," and released the second time on June 15th. He was arrested on the charge of killing Reilly in the evening of June 16th. He was not at Reilly's drug store, nor in that vicinity, on June 15th or June 16th. He signed the written confession, not voluntarily, but because he was forced to do so by police officers, who beat him and threatened him. The statements contained in the written confession are not true and he did not make them. After his arrest on this charge, he was taken to Reilly's drug store in an automobile, with Arthur Lubker and several police officers, but he did not point out any

places to the officers along the route nor make any explanation to the officers while in the drug store.

The clerk of the Lexington Hotel and several police officers were called as witnesses in the defendant's behalf. The hotel clerk testified that the defendant registered at the Lexington Hotel on June 15, 1928, and was still registered there at the time of his arrest in the evening of June 16th; that Sergeant Dempsey came to the hotel about 8:30 in the evening of June 16th and learned that the defendant was registered there; and that, about a half hour later, he returned to the hotel, and reported that he had found the defendant, and was permitted to visit the defendant's room. The police officers testified that a yellow taxicab was found a few blocks south of Reilly's drug store, with the engine running, shortly after the killing of Reilly was reported; that no guns were found in the taxicab; and that no attempt was made to find finger prints on the taxicab. One of these witnesses read to the jury the following statement, from the record of the police department: "Ralph Bold, 4175 DeTony, who was in the store at this time, called at this office and stated that Murphy looks like the man."

In rebuttal for the State, the police officers referred to by the defendant testified that they did not coerce, threaten, nor mistreat him in any way. Howard Sidener, city attorney, testified: The defendant was brought to his office sometime in June, 1928. He told the defendant that he (the defendant) was under no obligation to make a statement, and that anything he said might be used against him. The defendant said that the statements contained in his written confession were true; that the police officers did not abuse, threaten, nor mistreat him; and that no one had promised him any leniency. J. L. Lemon, assistant circuit attorney, testified: He talked to the defendant and Sergeant Dempsey in the outer office of the circuit attorney's office while they were waiting to see Mr. Sidener. Sergeant Dempsey said to the defendant: "Tell him whether or not you killed that druggist." The defendant replied: "Yes, I did."

I. The defendant now contends, for the first time, that the trial judge made remarks, during the progress of the trial, which were prejudicial to him. Since the defendant did not raise this question in the trial court, he is not in a position to raise it in this court. However, we have carefully reviewed the record, with this question in mind, and find no remarks on the part of the trial judge by which the jury could have been prejudiced against the defendant.

II. The defendant also complains of Instruction No. 1, which reads as follows:

"Murder in the First Degree is the killing of a human being wilfully, deliberately, premeditatedly and with malice aforethought.

"'WILFULLY' means intentionally not accidentally.

"'DELIBERATELY' means done in a cool state of the blood. It does not mean brooded over or reflected upon for a week, a day or an hour, but it means an intent executed in a cool state of the blood in the furtherance of a formed design to gratify a feeling of revenge OR TO ACCOMPLISH SOME OTHER UNLAWFUL PURPOSE, and not under the influence of a violent passion suddenly aroused by some lawful or just provocation.

"If therefore, in such a state of mind the defendant formed a design to kill and did kill Charles A. Reilly, it was deliberately done.

"'PREMEDITATEDLY,' means thought of before hand, for any length of time, however short.

"'MALICE' in its legal sense as used in these instructions does not mean mere spite, ill will, hatred or dislike, as it is ordinarily understood, but it means that condition of the mind which prompts a person to take the life of another intentionally, without just cause, justification or excuse, and signifies a state of disposition which shows a heart regardless of social duty and fatally bent on mischief.

"'MALICE AFORETHOUGHT' means malice with premeditation.

"Bearing in mind these definitions, the court instructs the jury that if it finds and believes from the evidence in this case, beyond a reasonable doubt, that the defendant, THOMAS MURPHY, at the city of St. Louis and State of Missouri, at any time prior to the finding of the indictment herein, wilfully, deliberately, premeditatedly and of his malice aforethought did shoot with a certain pistol one CHARLES A. REILLY, and within a year and day thereafter, to-wit, on the SIXTEENTH day of June, 1928, said CHARLES A. REILLY died from the effects of such shooting and wounding, it will find the defendant, THOMAS MURPHY, guilty of murder in the first degree and so say in its verdict, and unless it finds the facts to be as stated in this instruction it will acquit the defendant.

"If under the evidence and instructions in this case, the jury finds the facts to be as stated in this instruction it will acquit the first degree, the law provides that the defendant, THOMAS MURPHY, shall suffer death, or be punished by imprisonment in the penitentiary during his natural life; the jury must decide which punishment shall be inflicted, and so state in its verdict."

This instruction is assailed on one ground only. It is argued that, because the words "or to accomplish some other unlawful purpose" (in the third paragraph) were written in capital letters,

this instruction unduly emphasized one particular phase of the case, and was, therefore, erroneous. It is a familiar rule that instructions should not unduly emphasize particular issues, theories, or defenses, in order that juries may not give undue weight to the parts of instructions so emphasized. But, in our opinion, this rule was not violated in this case. It appears that, in addition to the words pointed out by the defendant, various other words, in Instruction 1 and in other instructions, were written in capital letters. In view of the extensive use of capital letters in the instructions, we cannot reasonably conclude that the jury in this case attached undue importance to certain words in the third paragraph of Instruction 1 merely because those words were written in capital letters. Moreover, those words were used in referring to an undisputed fact—the fact that the man who shot Reilly was, at the time of the shooting, attempting to accomplish an unlawful purpose, that is, attempting to commit robbery, and, for that reason, the emphasis given those words, by writing them in capital letters, could not have been prejudicial to the defendant. It follows that there is no merit in the attack made on Instruction 1.

III. The defendant further contends that he was entitled to a new trial on the ground of newly discovered evidence. The only proof offered in support of the motion for a new trial was the following affidavit:

"Exhibit A.

"State of Missouri⎫
⎬ss.
"City of St. Louis⎭

"Irving L. Spencer, being duly sworn, upon his oath deposes and says that he is attorney for Thomas Murphy, charged by an indictment in the Circuit Court of the City of St. Louis with Murder in the First Degree, and having been convicted and sentenced to death; that your affiant was not acquainted with said cause, and did not start to prepare the same until about four days prior to the trial thereof; that Paul A. Richards, attorney, who was to defend the said defendant, was taken ill and sent to a hospital about one week prior to said trial; that said Richards was operated upon and, due to his condition, the affiant was unable to discuss the case with him.

"Your affiant further states that since the trial of said cause he has discovered a witness, one John English, who states that he was in the store of the deceased Reilly on June 16, 1928, at the time the murder of said Reilly occurred; that said English has told your affiant that the defendant, Thomas Murphy, does not resemble the man who killed Reilly; that he saw said man; that said man wore no glasses; that the witness Bold, who testified at the trial that he positively identified the defendant on the evening of the

killing and subsequently thereto at the Central District Police Station, did not tell the truth, and committed perjury; that the said English was at said Police Station with the said Bold and other witnesses; that neither the said Bold nor any of the other witnesses were able to identify the said defendant; that they gave entirely different descriptions of the assassin; that said English was subpoenaed by the State and excused, on the second evening of the trial, by Assistant Circuit Attorney Bowcock.

"Your affiant further states that the said Bowcock had agreed with him not to discharge any of the witnesses without the mutual consent of each other; that your affiant had said English called but he did not answer.

"Your affiant further states that he did not subpoena said English because he did not know, and had no means of knowing, to what said witness would testify; that said witness was indorsed upon the indictment by the State; that your affiant discussed the case with Assistant Circuit Attorney Bowcock prior to the trial and was informed by him that two eyewitnesses identified the defendant; that your affiant presumed that witness English was one of said identifying witnesses; that your affiant did not know until after the trial of said cause that the said English was able to give material evidence on behalf of the said defendant; that he used due diligence under the circumstances to prepare said cause and was not able to discover, by the exercise of due diligence, the information possessed by the said English until after the trial of said cause.

"Your affiant further states that the said English has informed him that he does not care to make an affidavit and does not want to be mixed up in the matter unless subpoenaed by the court.

"(Signed) Irving L. Spencer.

"Subscribed and sworn to before me, a Notary Public, this 25th day of October, 1928. My commission expires September 16, 1931.

"(Signed) Douglas H. Jones,

"(Notarial Seal)                                  Notary Public."

The affidavit of defendant's counsel tends to show that he was advised, before the trial, that John English was in the drug store at the time Reilly was killed; that he "presumed" English had identified defendant as the man who killed Reilly because the assistant circuit attorney told him "two eyewitnesses identified the defendant;" that English was subpoenaed by the State and excused by the assistant circuit attorney after attending the trial for two days; and that he "had English called," to testify in defendant's behalf, and English did not answer. In this connection, the record shows that, shortly after the State closed its case in chief, defendant's counsel requested the bailiff to call English to the witness stand, and, when the bailiff reported "nobody out there," defendant's counsel said: "Well, if he is not here, we can't use him."

The record also shows that defendant's counsel made no further effort to procure the testimony of English, by requesting the State to recall him, or by requesting the issuance of a new subpoena for him, or by any other means, although the trial continued for several hours thereafter. In the face of these disclosures, we cannot agree with defendant's counsel in the statement "that he used due diligence under the circumstances, and was not able, by the exercise of due diligence, to discover the information possessed by English until after the trial." Furthermore, defendant's counsel did not procure an affidavit from English as to what his testimony would be in the event of another trial of this case. Indeed, it appears that English declined to make such an affidavit. But, even though his testimony should be as favorable to the defendant as the affidavit of defendant's counsel indicates, it is not probable that such testimony would produce a different result at another trial. According to well-settled rules, the defendant failed to show that he was entitled to a new trial on the ground of newly discovered evidence, and, therefore, we must hold that his request for a new trial on that ground was properly denied. See State v. Cushenberry, 157 Mo. 168, 56 S. W. 737; State v. Walker, 250 Mo. 316, 157 S. W. 309; State v. Smith (Mo. Sup.), 247 S. W. 154, and cases cited.

In the foregoing discussion, we have disposed of all questions presented for our consideration in defendant's brief. An examination of the entire record discloses no error. The indictment and the verdict are in approved form. The evidence is amply sufficient to support the verdict. The jury were properly instructed on all issues of law arising in the case. We are satisfied that the defendant was given a fair and impartial trial. The judgment is affirmed, and execution ordered in conformity therewith. *Davis* and *Cooley, CC.,* concur.

PER CURIAM:—The foregoing opinion by HENWOOD, C., is adopted as the opinion of the court. All of the judges concur.